**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ITEX CORPORATION,

           Plaintiff,

vs.

GLOBAL LINKS CORP. and BXI
TRADE EXCHANGE, Inc.,

        Defendants.

2:14-cv-00057-RCJ-NJK

**ORDER**

This case arises from Defendants allegedly engaging in false advertising and trademark infringement.  Pending before the Court is ITEX's Motion for Partial Summary Judgment (ECF No. 22) on its second and third causes of action for false and misleading advertising as prohibited by the Lanham Act, 15 U.S.C. § 1125(a).  Defendants have filed an Opposition (ECF No. 30) and ITEX submitted a Reply (ECF No. 35).  For the reasons contained herein, ITEX's Motion is GRANTED.

**I.     PROCEDURAL HISTORY AND FACTS**

The following facts are undisputed.  ITEX is a publicly-owned barter and exchange company that provides a marketplace for commercial transactions, which enables member businesses to trade products and services without exchanging cash. (White Decl. ¶ 4, ECF No. 24).  ITEX maintains a network of independent brokers who facilitate the operation of ITEX's exchange marketplace by enrolling new members, educating the new members in marketplace

policies and procedures, and providing information about products and services available in the marketplace. (*Id.* ¶ 6). ITEX provides brokers with training and support in their efforts to enlist additional members. (*Id.*). ITEX collects a certain percentage of each transaction that occurs within its marketplace as its primary source of revenue. (*Id.* ¶ 7).

ITEX's current barter and exchange business is the product of various mergers and acquisitions that have occurred over the past twenty years. BXI Trade Exchange, Inc. ("BTE California"), a California corporation formerly known as BX International, Inc., (*Id.* ¶ 8), was founded in 1960 and has been referred to as the original barter exchange company. (Resp. to Req. Admis. No. 3, ECF No. 23-3). BTE California amassed approximately 20,000 members and operated under the "BXI" word trademark and "BXI circular arrow" ("BXI Marks") trademark as early as 1987. (White Decl. ¶ 8).

By December 31, 1997, BTE California had transferred all of the assets related to the BXI exchange business, including the BXI Marks and goodwill, to Business Exchange International Corp. ("BEI"), an affiliated Nevada corporation. (Stock Purchase Agreement § 2.22(c), ECF No. 24-1). ITEX owned 50% of BEI through a wholly-owned subsidiary. The remaining 50% ownership of BEI was held by Saul Yarmak, who at the time was BEI's president. (*Id.* § A). On June 25, 1998, ITEX purchased Yarmak's 50% ownership of BEI, along with the assets of the BXI exchange business, for $3.6 million. (*Id.* §§ 1.2, 2.22(c)). Thereafter, ITEX changed the name of BEI to BXI Corporation, which continued to operate the BXI exchange business under the BXI Marks. (White Decl. ¶ 11; Cert. of Amend., ECF No. 24-2).

In January 2000, BXI Corporation sold the BXI exchange business, including "all of the goodwill of the Business," to TAHO Enterprises, Inc. ("TAHO"), a Massachusetts corporation. (Asset Purchase Agreement § 2.1). A few years later, TAHO reincorporated in Delaware and

changed its name to BXI Exchange, Inc. (Merger Agreement, ECF No. 24-5; Cert. of Amend., ECF No. 24-6)   From 2000 to 2005, BXI Exchange, Inc. operated the BXI exchange business under the BXI Marks as well as the goodwill developed up to that point. (White Decl. ¶ 14)   In July 2005, ITEX reacquired the BXI exchange business and the BXI Marks as part of a merger agreement between BXI Exchange, Inc. and ITEX's wholly-owned subsidiary, BXI Acquisition Sub, Inc. (Agreement and Plan of Merger §§ 1.1, 2.16, ECF No. 24-7)   BXI Exchange, Inc. was the surviving entity of the merger. (*Id.*)   BXI Exchange, Inc. represented that it held all assets related to the BXI exchange business, including the BXI Marks and the associated goodwill. (*Id.* §§ 2.11, 2.16)   To date, BXI Exchange, Inc. remains ITEX's wholly-owned subsidiary. (White Decl. ¶ 15).

Defendant Global Links Corp. ("Global Links") is a real estate development company. (*See* OTC Filing, ECF No. 23-10, at 8)   Frank Dobrucki, a former BEI employee, serves as Global Link's president, secretary, treasurer, and director. (Resp. to Interrog. No. 1, ECF No. 23-7)   Defendant BXI Trade Exchange, Inc. ("BTE Nevada") is a Nevada corporation that was formed by Yarmak in 2006 for the purpose of transferring pre-existing real estate assets between privately held corporations. (BTE Nevada Articles of Incorp., ECF No. 23-9; Yarmak Decl. ¶ 6, ECF No. 32)   Global Links acquired BTE Nevada in 2013 and Dobrucki was appointed president while Yarmak remained in other capacities. (Dobrucki Decl. ¶ 8, ECF No. 31; *see also* BTE Nevada Articles of Incorp.).

In 2012, Defendants conducted a federal trademark search on the BXI word mark and logo and discovered that the mark had been cancelled on December 17, 2010. (USPTO BXI Trademark Search Results, ECF No. 31-4)   Dobrucki then filed an application to register "BXI Trade Exchange" as a federal trademark. (Dobrucki Decl. ¶ 5)   The trademark was published for

opposition on March 26, 2013 and it was registered on February 18, 2014. (USPTO BXI Trade

Exchange Trademark Entry, ECF No. 31-5).

On June 25, 2013, Global Links issued a press release titled "Global Links Corp.

Acquires BXI Trade Exchange, Inc. – The Original Barter Company."  The release stated that:

> Global Links Corps. (GLCO) announced today that it has acquired 100% of BXI
> Trade Exchange, Inc., a Nevada corporation, along with the federal trademark for
> "BXI Trade Exchange."  BXI, formerly the world's largest barter trade exchange,
> will soon be fully operational with plans to once again become the premier
> marketplace for the barter industry. . . . Saul Yarmak, the former Chairman and
> Principal Owner of BXI before taking a break from the industry, is committed to
> once again be a driving force in the day-to-day operations of the exchange.  The
> company's stated intention is to quickly make BXI the recognized "Gold-
> Standard" of the barter industry while maintaining the highest level of ethics and
> reputation it was previously known for.  At its peak, prior to the widespread use
> of the Internet for online business communications and transactions, BXI had
> more than 100 offices and 22,000 business members.

(June 25, 2013 Press Release, ECF No. 24-9, at 2–3; *see also* BTE Nevada Press Release, ECF

No. 23-16, at 2–3).  Defendants made subsequent statements referring to BXI as being "back in

business with plans to again become the premier marketplace for the barter industry." (BTE

Registration Page, ECF No. 24-11 (stating also that "if you were a previous BXI member[,] [w]e

are anxious to welcome you back)).  Defendants published these and similar statements on

websites, social media, and through online promotional materials. (*See, e.g.*, Email Chain, ECF

No. 24-9; Facebook Posts, ECF No. 24-12; Weekly National Barter News Email, ECF No. 24-

16; NW Barter Brokers Newsletter, ECF No. 24-18).

Defendants also posted a "Short History of BXI" on BTE Nevada's website in which they

state, in part, that "BX International, Inc. (Business Exchange International) was founded in

1960 and originated the modern-day concept of computerized barter.  Mac J. McConnell founded

the BXI system by combining his skills in the fields of banking and accounting to form local

trade exchanges across the country. . . . Because of its 36 years of solid service and proven

record in the trade industry, BXI enjoys a prestigious position in barter circles and is well positioned to service the growing need for additional barter exchanges across the country.  We continue our out of the box approach and look forward to 36 + more solid years." (History of BXI, ECF No. 24-15).

ITEX alleges that these statements by Defendants constitute false and misleading advertising in violation of Section 43(a) of the Lanham Act.   It filed this lawsuit seeking, in part, a permanent injunction to prohibit Defendants from making any further statements that BTE Nevada is related in any way to the BXI exchange business that ITEX purchased in 1998 and then reacquired in 2005.  ITEX currently seeks summary judgment only on its second and third causes of action.  The second cause of action alleges that Defendants engaged in false advertising by intentionally making false statements regarding BTE Nevada's business. (Compl. ¶ 28, ECF No. 1).  The third cause of action alleges that Defendants engaged in misleading advertising by misconstruing BTE Nevada's origin and its purported relation to the original BXI exchange business. (*Id.* ¶ 36).  ITEX also seeks attorneys' fees pursuant to 15 U.S.C. Section 1117(a).

## II.   LEGAL STANDARD

A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather, only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.  This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  Conversely, where reasonable minds could differ on the facts proffered in support of a claim, summary judgment should not be granted.  *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008).  "Summary judgment is inappropriate if reasonable jurors . . . could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

///

///

1  **III.     DISCUSSION**

2          Before determining whether ITEX is entitled to a permanent injunction, the Court must

3  first decide whether Defendants' various statements have violated the Lanham Act.  Then, if a

4  violation is found, ITEX will be entitled to attorneys' fees only if the Court determines that this

5  is an "exceptional case" as required by 15 U.S.C. Section 1117(a).

6          **A.  False Advertising**

7          The purpose of the Lanham Act is to protect persons engaged in commerce against unfair

8  competition. *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014).  Section

9  43(a) of the Lanham Act states that any person who uses in commerce any false or misleading

10  description of fact, which is likely to cause confusion or mistake as to the affiliation, connection,

11  or association by such person with another person shall be liable in a civil action. 15 U.S.C.

12  § 1125(a).

13          Accordingly, to establish a violation of the Lanham Act for false advertising, a plaintiff

14  must show: "(1) a false statement of fact by the defendant in a commercial advertisement about

15  its own or another's product; (2) the statement actually deceived or has the tendency to deceive a

16  substantial segment of its audience; (3) the deception is material, in that it is likely to influence

17  the purchase decision; (4) the defendant caused its false statement to enter interstate commerce;

18  and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by

19  direct diversion of sales form itself to defendant or by a lessening of the goodwill associated with

20  its products." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *see*

21  *also* 15 U.S.C. § 1125(a)(1)(B).

22          Since the Lanham Act is violated by either false or misleading advertisements, these

23  factors apply to both the second and the third causes of action stated in ITEX's Complaint.  *See*

24

7

*TrafficSchool.com, Inc. v. eDriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011).  The Court, therefore, will conduct a single analysis to determine whether Defendants' statements are actionable.

### 1.  False or Misleading

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139.  To determine whether an advertising claim is literally false, the advertisement "must always be analyzed in its full context." *Id.*  The statement at issue must be more than mere "puffery," *id.* at 1145, it must be "clearly one of fact, able to be proven true or false." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999).  Moreover, "[l]iteral falsity is a question of fact, and summary judgment should not be granted where a reasonable jury could conclude a statement is not false." *K&N Eng'g, Inc. v. Spectre Performance*, No. EDCV09-01900-VAP, 2011 WL 4387094, at \*9 (C.D. Cal. Sept. 20, 2011) (citing *Southland Sod Farms*, 108 F.3d at 1139).

ITEX alleges that the following statements made by Defendants are literally false or otherwise misleading:

1.  "Global Links Corp. Acquires BXI Trade Exchange, Inc. – The Original Barter Company." (June 25, 2013 Press Release, ECF No. 24-9).

2.  "[F]ormerly the world's largest barter trade exchange, is 'back-in-business' with plans to again become the premier marketplace for the barter industry!" (Facebook Post, ECF No. 24-12).

3.  "BXI was formerly the world's largest trade exchange, before the widespread use of the internet, and since announcing its re-opening, the company has gained a tremendous amount of interest and outreach from former members." (Aug. 6, 2013 Press Release, ECF No. 24-20).

4. "We expect BXI to quickly become the largest barter exchange company as it once was by realizing rapid growth." (Oct. 24, 2013 Press Release, Statement by Saul Yarmak, ECF No. 24-10).

5. "Saul Yarmak, the former Chairman and Principal Owner of BXI before taking a break from the industry, is committed to once again be a driving force in the day-to-day operations of the exchange." (June 25, 2013 Press Release).

6. "At its peak, prior to the widespread use of the Internet, BXI had more than 22,000 business members." (*Id.*).

7. "BXI's come back will once again make them the largest barter company in the nation." (BXI San Fernando Update, ECF No. 24-17).

8. Defendants use the "History of BXI" in their marketing and promotional materials that explains how BTE California was founded in 1960 and about its subsequent success. (Short History of BXI, ECF No. 24-15).

The Court finds that many of these statements are clearly false, either facially or by necessary implication, *Southland Sod Farms*, 108 F.3d at 1139, and that a reasonable juror could not find otherwise.  As an initial matter, it is evident that Defendants equivocate the meaning of "BXI" in all of these statements.  BXI, as used by Defendants, can have only one of two meanings.  It must either refer to the original BXI exchange business, with which Defendants can claim no legal relationship, or it must refer to BTE Nevada's exchange business.  Under either meaning, at least some of the above statements are literally false.

Although Global Links did acquire BXI Trade Exchange, Inc., Defendants admit that BTE Nevada is not the original barter company. (Resp. to Req. Admis. 3, ECF No. 23-3).  In fact, Defendants acknowledge that BTE California was the original barter company, "which later became BX International, Inc., which was referred to as 'BXI.'" (*Id.*).  BX International transferred all of its assets, including its goodwill, to BEI, which was subsequently purchased in its entirety by ITEX.  Yarmak's new business, BTE Nevada, is not a successor-in-interest of BX International.  Moreover, BTE Nevada's only connection with BX International and BEI is

Yarmak and Dobrucki's involvement in the original company. However, as Yarmak himself admits, BTE Nevada is a new company founded in 2006 and, besides the participation of former BEI employees, it is unrelated to the BXI exchange business that operated in the 1980s and 1990s. (Yarmak Decl. ¶ 6). Thus, referring to BTE Nevada as the "Original Barter Company" is a false statement, either on its face or by the necessary implication that BTE Nevada is related to the original BXI exchange business.

To the extent that Defendants intend "BXI" in these statements to mean the original BXI exchange business operated by BTE California, the statement is still false. First, Defendants have no right to make such a claim even if it were true. BXI is not an amorphous term that simply represents qualities of the barter trade industry. It is the name of a specific exchange business, and although ownership of that marketplace has changed through the years, (*see* Defs.' Opp'n 3, ECF No. 30), BXI remains an identifiable asset that is owned by ITEX, (*see generally* Agreement and Plan of Merger, ECF No. 24-7). Thus, if BXI refers to the exchange business operated by BX International and BEI, the statement is false because Global Links did not acquire the successor-in-interest of these companies.

The Court also notes that calling BTE Nevada the "Original Barter Company" is not an instance of mere puffery. Puffery "is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Southland Sod Farms*, 108 F.3d at 1145 (citation omitted). In this case, however, referring to BTE Nevada as the "Original Barter Company" is something that consumers in the barter trade industry would rely upon due to the history of the BXI name. (*See* June 25, 2013 Press Release (stating that BXI would "once again be the premier marketplace")). BTE California is recognized by many in the industry as being the original barter company, (Resp. to Req. Admis. No. 3, ECF No. 23-3), and by representing BTE Nevada

1    as the "Original," Defendants undoubtedly intended for potential members to make that

2    connection.

3          Furthermore, the statements referring to BXI being "back in business" and "re-opening"

4    are also false.  As Defendants concede, BTE Nevada has never been in the exchange business,

5    quit, and then reentered the market. (Resp. to Req. Admis. No. 12, ECF No. 23-3).  Nor has BTE

6    Nevada ever closed its doors such that it would need to reopen. (Resp. to Req. Admis. No. 8,

7    ECF No. 23-3).  Characterizing BTE Nevada's current efforts to establish a barter network as a

8    "come back" that will "once again make them the largest barter company in the nation" also

9    contains falsities.  As stated, BTE Nevada has nothing to come back from since it has never

10   operated an exchange business, ceased operations, and then began operations once more.  BTE

11   Nevada has also never been the largest barter company in the nation, a fact that Defendants

12   concede is true.[1] (*See* Resp. to Req. Admis. No. 10, ECF No. 23-3).  Thus, any statement

13   referring to BTE Nevada as being back in business, re-opening, or once again obtaining

14   prominence in the industry is false because it necessarily implies that it has operated in the past.

15         If Defendants intended these statements to refer to the BXI exchange business that was

16   conducted by BTE California and BX International, the statements remain false.  As previously

17   stated, the original BXI exchange business is owned by ITEX.  Accordingly, Defendants are in

18   no position to claim that it is back in business or re-opening.  And because Defendants cannot

19   assert a legal relationship to the original BXI exchange business, claiming that it is "back" is

20   false by necessary implication.

21         Even more troubling to the Court, however, is the misleading nature of Defendants'

22   statements.  Defendants are adamant that they have established a "new" BXI, (Resp. to Interrog.

---

[1] The Court again notes that this assertion is more than mere puffery since the original BXI exchange business was considered the largest barter trade company at one time. (*See* Resp. to Req. Admis. No. 6, ECF No. 23-3 (implying that the original BXI—presumably BTE California—was recognizably the largest at its peak)).

No. 7, ECF No. 23-3), and have even represented in regulatory filings that the "present BXI is in no way connected to the past BXI," (OTC Filing, ECF No. 23-10, at 8). Yet they have made no effort to distinguish BTE Nevada from the original BXI exchange business in their advertising, choosing to instead present BTE Nevada as a continuation thereof.[2]

References to BTE Nevada as the "Original Barter Company" and formerly the largest barter trade exchange are misleading because a consumer in the industry would undoubtedly understand these statements to mean that BTE Nevada is the successor-in-interest to BX International. Likewise, stating that BTE Nevada is "back in business," "re-opening," and that it will become the exchange company it "once was" are all misleading in that they necessarily imply that BTE Nevada is, at the least, related to and affiliated with what was once BX International and BTE California. Defendants' claim that "the company has gained a tremendous amount of interest and outreach from former members" further solidifies the misleading nature of these statements. BTE Nevada has no former members from whom to gain interest and outreach. (Yarmak Decl. ¶ 6 (stating that BTE Nevada did not operate any barter business when it was formed)). This statement must refer to former members of the marketplace operated by BX International that was ultimately acquired by ITEX.

The statements that Yarmak is "once again" committed to being a driving force in the day-to-day operations of the exchange and that BXI once had "22,000 members" may not be literally false on their face. Indeed, Yarmak may be committed to developing BTE Nevada's

---

[2] Indeed, Yarmak named the company BXI Trade Exchange, Inc., which is identical to BTE California's name. Defendants also adopted a trademark that is very similar if not identical to the BXI Marks that ITEX purchased in 1998 and then again in 2005. Regardless of whether Defendants' trademark is valid, which is not before the Court at this time, it is clear that Defendants are attempting to present BTE Nevada as the successor-in-interest of BTE California and BEI. Even assuming that Defendants' trademark is valid and their use thereof does not infringe on ITEX's rights, a newly issued trademark would not allow Defendants to misappropriate the goodwill of the original BXI exchange business. First, most of the statements at issue in this case were made in 2013, prior to the February 2014 registration date for the new trademark. Second, the Court notes that the false and misleading statements at issue in this case are not problematic because they include the "BXI" name. The statements are problematic because they state that BXI is back, that it is re-opening, and that it will once again be the industry leader. The necessary implication of these statements is that BTE Nevada is the same BXI that operated previously, which is not true.

exchange business, and it is undisputed that the original BXI did in fact have around 22,000

members. (*See* Resp. to Req. Admis. No. 20, ECF No. 23-4).  However, the Lanham Act

encompasses more than "blatant falsehoods." *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d

255, 257–58 (9th Cir. 1995).  "It embraces innuendo, indirect intimations, and ambiguous

suggestions evidenced by the consuming public's misapprehension of the hard facts underlying

an advertisement." *Id.*

  The context in which these statements were made—press releases regarding BTE

Nevada's business—demonstrates their tendency to mislead consumers into thinking that BTE

Nevada is the successor-in-interest of the BXI exchange business operated by BX International

and then BEI.  By stating that Yarmak is "once again" committed to "the exchange" implies that

he is committed to the same exchange for which he worked previously, which is misleading

since BTE Nevada is a new exchange altogether.  Also, by referencing the membership held by

the original BXI exchange business in a press release dedicated to the announcement that Global

Links acquired a company by the same name misleads the reader to associate the success of the

original exchange business with BTE Nevada's new exchange business.

  Defendants have gone to great lengths to represent BTE Nevada as the successor of the

BXI exchange business.  And while Defendants' efforts to establish a competing barter and trade

marketplace would alone not be actionable, their strategy in this case has been to usurp the

goodwill of the original BXI business by relying on the reputation of BX International, BTE

California, and BEI, which was accumulated over years of serving BXI members.  This is

something that Defendants cannot do, even if Yarmak contributed to those efforts. *See Skydive

Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) (holding defendant liable for false

advertising because it misappropriated plaintiff's goodwill).  Yarmak sold his interest in BEI and

the BXI exchange business to ITEX in 1998.  As part of that transaction, BEI transferred all interest in the BXI exchange business to ITEX.  It is uncontested that this included the goodwill and reputation that BXI accumulated during its operations prior to the sale.  And certainly ITEX understood that it was paying millions of dollars for the right to claim and utilize BXI's past history. (White Decl. ¶¶ 9–10).  Defendants' representation that BXI is back and re-opening is simply an effort to capitalize off of the goodwill that Yarmak sold to ITEX years ago.

Defendants argue that the above statements are neither false nor misleading because they have never claimed that BTE Nevada "is the same legal entity that was started in California." (Defs.' Opp'n 9–10).  Rather, Defendants claim that the statements are true because "the same individual[] officers and principals who ran and operated the BXI Trade Exchange" through BX International "have reopened 'BXI Trade Exchange' under a valid federal trademark registration." (*Id.* at 10).

These arguments are not persuasive.  Defendants need not claim that BTE Nevada is the same corporation that started in California in order for their statements about being back in business to be false or misleading under the Lanham Act. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (implying that the "*sine qua non*" of a Lanham Act violation is "consumer confusion").  The fact that some of the individuals involved with the original BXI exchange business are also participating in BTE Nevada's business does not alleviate or remedy the falsity of Defendants' statements.  Defendants' press releases do not advertise that individuals once affiliated with the BXI exchange business are "back in business"; instead, the statements claim that BXI itself is reopening.  Defendants make no attempt whatsoever to clarify that the BXI to which they are referring is new or recently founded.

Moreover, Defendants' argument that the truth of its statements is proven by the participation of past BXI employees and affiliates in BTE Nevada's new exchange actually demonstrates their misleading nature. For instance, Defendants posted numerous photos on Facebook showing Yarmak and other former participants in the original BXI exchange business at BTE Nevada's "Soft Launch & Training Session" accompanied by comments that "BXI has the management team to become number one again." (Facebook Posts, ECF No. 24-12). A consumer in the industry familiar with the original BXI exchange business and its affiliates would surely be misled by these comments and photos into believing that BTE Nevada is related to the original BXI exchange business.

To the extent that Defendants argue that Yarmak's participation in both the original business and the new business somehow make their statements less false or misleading, the Court disagrees. Yarmak may certainly tout his experience, knowledge, and past involvement with BX International and the BXI exchange business as evidence that the new BTE Nevada exchange will become the modern "Gold-Standard" in the barter industry. *See Southland Sod Farms*, 108 F.3d at 1139 (recognizing that the Lanham Act prohibits only those statements that are false or misleading). What he cannot do, however, is imply that BTE Nevada is in any way affiliated with or related to the original BXI.

In a last ditch effort to avoid a finding that its various statements are false or misleading, Defendants argue that its advertisements do not violate the Lanham Act because they discuss the "company" rather than the "product." (Defs.' Opp'n 11). This argument fails. The purpose of the Lanham Act is to protect consumers from anti-competitive behavior including false advertising related to a person's product *or* service. *See* 15 U.S.C. § 1125(a)(1)(A); *POM Wonderful LLC*, 134 S. Ct. at 2234. Where a company performs services rather than selling a

15

1    particular good, its service is its product.  Further, a service-oriented company generates

2    goodwill by efficiently and promptly performing the service for which it is hired.  *See WMX*

3    *Techs., Inc. v. Miller*, 197 F.3d 367, 374 (9th Cir. 1999) (defining goodwill of a business as "its

4    value as a going concern [that] is made up of many factors, such as location, patronage of

5    customers, relations with suppliers, experience of employees, effectiveness of management, and

6    many other factors").  The company and its name, therefore, become synonymous with the

7    quality of service it provides.  Accordingly, Defendants' references to the original BXI exchange

8    business itself is the equivalent of referencing its product, which is precisely what Defendants'

9    press releases, Facebook posts, and other advertisements did in this case.[3]

10          The Court also notes that Dobrucki's claim to have authored the "History of BXI," (*see*

11   Dobrucki Decl. ¶ 2), is completely irrelevant to ITEX's claims of false or misleading advertising.

12   Authorship has nothing to do with the history that the piece describes.  The short review of

13   BXI's history explicitly refers to BX International, Mac McConnell, and the spread of the

14   original BXI exchange business. (*See* Short History of BXI, ECF No. 24-15).  Even if Dobrucki

15   holds the copyright to the piece, it is no less misleading to include it on BTE Nevada's website

16   as doing so implies that BTE Nevada claims a direct legal relationship with BEI and its history

17   beyond what other barter trade companies could claim.

18          Therefore, the Court finds that at least some of Defendants' statements are literally false

19   since BTE Nevada is not the "Original Barter Company," back in business, or re-opening its

20   exchange business.  The remaining statements, while perhaps not false on their face, are false by

---

21
22   [3] The Court also finds unavailing Defendants' arguments that ITEX has abandoned the use of the BXI name and
     trademark.  This argument is more relevant to the issues of infringement and false designation of origin than to
     whether Defendants engaged in false advertising. *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th
23   Cir. 2007).  But even if the Court assumes, without finding, that ITEX does not currently use the BXI name in its
     exchange business, such a fact does not make Defendants statements any less false or misleading. BTE Nevada is a
24   new company that cannot claim to be back in business, and regardless of whether ITEX uses the BXI name
     currently, it still owns what was the original BXI exchange business.

1      necessary implication because they imply that BTE Nevada is affiliated with or related to the

2      original BXI exchange business that Yarmak sold in 1998. *Southland Sod Farms*, 108 F.3d at

3      1139; *FLIR Sys., Inc. v. Sierra Media, Inc.*, 903 F. Supp. 2d 1120, 1129 (D. Or. 2012)

4      (recognizing that an advertisement can be literally false even though it does not explicitly make a

5      false assertion "if the words and images, considered in context, necessarily and unambiguously

6      imply a false message").  At the very least, the statements are misleading since they would likely

7      cause a consumer in the barter industry to confuse BTE Nevada with the original BXI exchange

8      business. *Skydive Ariz., Inc.*, 673 F.3d at 1111.

9                     **2.   Commercial Advertisement**

10         Under the Lanham Act, statements constitute commercial advertising if they are "(1)

11      commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for

12      the purpose of influencing consumers to buy defendant's goods or services. . . . [and] (4) [are]

13      disseminated sufficiently to the relevant puschasing public to constitute 'advertising' or

14      'promotion' within that industry." *Coastal Abstract Serv., Inc.*, 173 F.3d at 735.  There can be

15      little debate that Defendants' statements constitute commercial advertisement, and Defendants

16      do not argue otherwise.

17         The statements at issue here related to Defendants' barter trade business that is in direct

18      competition with ITEX. (*See* White Decl. ¶¶ 4–7 (desciribing ITEX's business)).  The various

19      press releases, Facebook posts, and advertisements were certainly made for the purpose of

20      convincing potential members to sign up to be a part of Defendants' exchange network.  The

21      various statements were published on the Internet on websites and social media, (*see* June 25,

22      2013 Press Release, ECF No. 23-16; Facebook post, ECF No. 24-12), as well as in

23

24

industry-specific digital fliers, (*see* Weekly National Barter News, ECF No. 24-16).  Thus, the statements constitute commercial advertisement.

### 3. Deception

Where an advertisement is literally false, "a presumption arises that consumers were in fact deceived and the burden shifts to the defendant to prove otherwise." *Del Webb Communities, Inc. v. Partington*, No. 2:08-cv-00571-RCJ-GWF, 2009 WL 3053709, at *13 (D. Nev. Sept. 18, 2009) (citing *William H. Morris Co.*, 66 F.3d at 258).  Defendants make no attempt to demonstrate how their statements do not have a tendency to deceive the consuming public.  Instead, they argue that ITEX has failed to present evidence of actual deception. (Defs.' Opp'n 12).  Had the Court found that the various statements at issue were only misleading and not literally false, then Defendants' articulation of ITEX's burden would be correct. *William H. Morris Co.*, 66 F.3d at 258.

However, Defendants' claims that BTE Nevada is the "Original Barter Company," that it is "back in business," and that it is "re-opening" are literally false statements.  BTE Nevada is not the original BXI exchange business nor is it the lawful successor-in-interest thereof.  BTE Nevada cannot claim that it is back in business or re-opening because it was never closed in the first place.  Similarly, any claim that BTE Nevada will "once again" be the nation's leading barter trade company is false by necessary implication.  Thus, the burden rests with Defendants to demonstrate that these statements do not have a tendency to deceive the public. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007); *William H. Morris Co.*, 66 F.3d at 258 (citing *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 (9th Cir. 1989); *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986)) .

Because Defendants offer no argument or explanation of why a consumer in the barter industry would not tend to be deceived by the advertisements at issue in this case, they have failed to meet their burden. *See Leatherman Tool Grp., Inc. v. Coast Cutlery Co.*, 823 F. Supp. 2d 1150, 1155 (D. Or. 2011) (finding that defendant had failed to present sufficient evidence to rebut the presumption that the literally false statements had a tendency to deceive).

Nevertheless, the facts in the record demonstrate that consumers were likely deceived by Defendants' statements.  The exhibits that ITEX cites in its Motion show at least some degree of consumer deception. For example, Defendants made the statement in one press release that "BXI was formerly the world's largest trade exchange before the widespread use of the internet, and since announcing its re-opening, *the company has gained a tremendous amount of interest and outreach from former members*." (Aug. 6, 2013 Press Release, ECF No. 24-20 (emphasis added)).  This quote from Dobrucki demonstrates that at least some members of the original BXI exchange network believe and understand BTE Nevada to be affiliated with the BXI business that ITEX purchased in 1998.

On another website, Defendants state that "[t]he BXI Trade Exchange, formerly the world's largest barter trade exchange, intends once again to become the premier marketplace for the barter industry.  We served our members for over 30 years helping them to conserve cash and improve their lifestyle." (Why BXI?, ECF No. 24-13).  Since BTE Nevada was established in 2006, it does not have a 30 year history of serving its members.  Yet in the context with the statement that BXI Trade Exchange was formerly the largest and intends to once again become premier, it certainly tends to deceive consumers into thinking that BTE Nevada is the original BXI exchange business.

Further, Defendants' specific references to BXI's history on its websites and in promotional materials certainly has a tendency to deceive consumers into believing that BTE Nevada is directly related to the original BXI exchange business. (*See* History of BXI, ECF No. 24-14; Short History of BXI, ECF No. 24-15; BXI San Fernando Valley Update, ECF No. 24-17 (stating "[f]or those that our [sic] new to the BXI name, I wanted to share the information below" and then pasting in the "History of BXI")).  Other statements, such as "please tell us if you were a previous BXI member[,] [w]e are anxious to welcome you back," (BXI Registration Page, ECF No. 24-11), also tend to deceive consumers because they imply that by being welcomed back, the exchange network the consumer is joining the same network or marketplace of which the consumer was previously a member.  Since BTE Nevada is a "new" barter and exchange network, (Resp. to Req. Admis. No. 7, ECF No. 23-4), it has no members to welcome back.

Therefore, the Court finds that the false and misleading statements at issue in this case have a tendency to deceive consumers regarding the relationship between BTE Nevada and the original BXI exchange business, and in certain cases they have caused actual deception.

### 4.  Materiality

A statement is material if it is "likely to influence the purchasing decision." *Southland Sod Farms*, 108 F.3d at 1139.  Moreover, if the statements at issue are found to be literally false, the court may presume materiality. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000).  In this case, the Court's finding that at least some of Defendants' statements are literally false allows the Court to presume the materiality of those statements. *Id.*  However, even if the Court did not make such a presumption, it is clear that the statements at issue here were made for the specific purpose of influencing consumers to join BTE Nevada's new exchange network and pay the accompanying fees.

The participation of a significant number of members in a barter exchange network is critical to the network's success. (White Decl. ¶ 27).  Prior to joining a particular network, it is common sense that potential brokers and members evaluate the exchange company's operating history, market presence, size of its customer base, and reputation. (*See id.*).  And certainly, a new exchange business's recruitment efforts would benefit if the company were able to attach itself to a previously operating network with a proven track record of successful transactions. Thus, statements regarding BXI being back in business and working to once again be a leader in the barter trade industry are material because they invoke a perceived relationship between the well-known and trusted original BXI exchange business and BTE Nevada's new marketplace. Indeed, at least some former BXI exchange members believed that BTE Nevada was in fact related to the original BXI exchange business. (*See* Aug. 6, 2013 Press Release, ECF No. 24-20). If the operating history of the original BXI exchange business was not material to consumers' decision of which exchange network to join, Defendants would likely not have gone to so much effort to present BTE Nevada as a continuation of the original BXI.

### 5.  Interstate Commerce

There is no question that the statements at issue entered interstate commerce.  They were published on websites and social media, and they were conveyed in industry-specific newsletters that were sent via email. *See United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (stating that "the Internet is both an instrumentality and channel of interstate commerce") (internal quotations and citations omitted).

### 6.  Damages

Defendants argue that ITEX has not demonstrated that it has been or is likely to be injured by the false statements. (Defs.' Opp'n 14).  They contend that ITEX's claim that "[i]f a

broker switches to a competing trade exchange business, ITEX loses that investment in time and resources" is insufficient proof of any harm because finding otherwise "would render the necessity of showing injury pointless in every claim brought by a competitor." (*Id.*).  However, this argument misunderstands the standard applicable in this type case.

Under the Lanham Act, "a competitor need not prove injury when suing to enjoin conduct that violates [S]ection 43(a)." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989).  This is quite different from a suit for damages under Section 43(a) where "actual evidence of some injury *resulting from the deception* is an essential element of the plaintiff's case." *Id.*  Here, ITEX is seeking to enjoin Defendants from further disseminating false or misleading advertisements. (Mot. Partial Summ. J. 25, ECF No. 22).  Accordingly, ITEX is not required to prove any injury before an injunction is appropriate. *See Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1181 (D. Or. 2008) (ruling that competitor had no need to present direct evidence of actual injury since only injunctive relief was sought).

### B.  Permanent Injunction

The undisputed evidence shows that Defendants' statements regarding BTE Nevada's exchange business violate the Lanham Act.  Therefore, an injunction permanently prohibiting Defendants from making false or misleading statements in the future is warranted.  Nothing is clearer in the law of commercial speech than that false or misleading commercial speech is "clearly 'subject to restraint.'" *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 383 (1977)).  The scope of the injunction is within the broad discretion of the district court. *TrafficSchool.com, Inc.*, 653 F.3d at 829.  However, the Court recognizes that "[i]njunctive relief under the Lanham Act must be narrowly tailored to the scope of the issues tried in the case" and that it "should be tailored to

1  eliminate only the specific harm alleged, but it should not be so narrow as to invite easy

2  evasion." *Skydive Ariz., Inc.*, 673 F.3d at 1116 (internal quotations and citations omitted).

3          Accordingly, Defendants are permanently enjoined from disseminating false or

4  misleading statements that imply that BTE Nevada's new exchange business is related to,

5  affiliated with, or the successor-in-interest of the original BXI exchange business that was owned

6  and operated by BX International, BTE California, BEI, and ITEX.  For instance, Defendants

7  may not state that BTE Nevada is back in business, re-opening, or that it was formerly the

8  world's largest barter trade exchange, but Defendants may claim that BTE Nevada is a *new*

9  exchange business that will *become* the nation's leader in the barter trade industry.

10         The Court notes that whether BTE Nevada may continue to use the BXI name and

11  trademark is still an issue to be decided in this case.  The Court's ruling here regarding the

12  injunction will remain in force regardless of the outcome of ITEX's remaining causes of action.

13  Even if at the conclusion of this litigation Defendants retain the right to use the BXI name and

14  trademark, they may not further represent in advertisements that their barter trade company is

15  connected to the original BXI exchange business (*e.g.*, by claiming to be re-opening).

16         However, the injunction does not prohibit Yarmak, Dobrucki, or any other individual

17  who was previously involved with the BXI exchange business from representing their past

18  experience.  Defendants may certainly claim that BTE Nevada will be successful and profitable

19  because past BXI principals and officers are at the helm.  Defendants may not claim, however,

20  that because some of BXI's past principals and officers are now working with BTE Nevada that

21  BTE Nevada has somehow transformed into the original BXI exchange business.  Doing so is

22  false and misleading, and the Lanham Act prohibits it. *POM Wonderful LLC*, 134 S. Ct. at 2234.

23  ///

24

**C.  Attorneys' Fees**

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  A case is exceptional if the defendant disseminated the false advertisements in a "fraudulent, deliberate, or willful" manner. *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1039 (9th Cir. 2007).  In other words, if Defendants acted with the deliberate intent to confuse consumers, attorneys' fees are warranted. *See id.* (finding that the defendant "made deliberate and calculated attempts to confuse" consumers).

The Court is hard pressed to find that Defendants' acts in this case were anything other than deliberate and willful.  First, Yarmak chose to form BTE Nevada under the name BXI Trade Exchange, Inc., which is identical to the name used by BTE California prior the eventual sale of the BXI exchange business to ITEX.  There can be little argument that adopting such a similar name is inherently confusing to consumers. *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955) (finding that use of confusingly similar name was intentionally false and misleading).

Second, Yarmak was a party to and personally benefited from the sale of the original BXI exchange business when ITEX paid $3.6 million to him in 1998 for the right to use the BXI name and benefit from its goodwill.  Yarmak knew intimately the details of that initial transaction, and Defendants were aware that ITEX reacquired the BXI business in 2005. (OTC Filing, ECF No. 23-10, at 8).  Thus, Defendants cannot claim that they were unaware that BTE Nevada is not the rightful successor-in-interest of the BXI exchange business.  Indeed, the Court perceives Defendants' false statements as Yarmak possibly attempting to "have his cake and eat it, too."  He made millions of dollars selling his 50% ownership of the BXI business to ITEX but he now seeks to profit off the goodwill of that same business.  The fact that "there has not been one 'BXI' entity," (Defs.' Opp'n 3), does not negate the fact that Yarmak relinquished all rights

to claim legal affiliation with BEI and its successors once he signed the Stock Purchase

Agreement in 1998. (Stock Purchase Agreement, ECF No. 24-1, at 26).

Third, repeatedly representing that BTE Nevada was formerly the "largest" barter trade

company in the world and that it would "once again" be the "Gold-Standard" in the industry

demonstrates a deliberate attempt to confuse consumers into thinking that BTE Nevada is

affiliated with the original BXI exchange business.  Attempting to "welcome back" past BXI

customers is also a willful attempt to mislead consumers into believing that they are joining a

marketplace that had been previously operational, which by Defendants' own admission is not

true. (Resp. to Req. Admis. No. 8, ECF No. 23-3).  Defendants also sought to influence

consumers' perception of BTE Nevada as being related to the original BXI exchange business by

releasing a statement that characterized BTE Nevada as the "Original Barter Company."

Fourth, the deliberate and willful nature of Defendants' actions is further manifested by

their publication of the "BXI History" on websites and in promotional material.  Defendants'

arguments regarding the authorship of the history aside, there can be no question that by

including a recitation of BXI's history on their websites and in advertisements, Defendants

intended to benefit from the goodwill that the BXI exchange business has accrued over the past

few decades.

Adding additional confusion, one BTE Nevada broker stated in promotional material that

"[her] best years in barter were the 13 years [she] worked for this company starting in 1994,

before they sold the membership in 2005." (BXI San Fernando Valley Update, ECF No. 24-17).

In fact, the Court is unsure whether this statement demonstrates willful deception or whether it is

evidence of actual deception.  On the one hand, here is a BTE Nevada broker claiming that she

started working for "this company" starting in 1994.  Since BTE Nevada was not formed until

2006, it is impossible that she worked for BTE Nevada at that time.  She is clearly referring to

BX International or another of the entities that owned and operated the BXI exchange business at

that time.

Furthermore, the broker's representation that she worked for the company before "they

sold the membership in 2005" is also troubling.  BTE Nevada did not sell the membership in

2005 because it did not exist until 2006.  The broker must be referring to ITEX's reacquisition of

the BXI exchange business in 2005.  Thus, these statements could certainly be understood as a

deliberate attempt to pass off BTE Nevada as the successor-in-interest of the BXI exchange

business.

On the other hand, the Court believes that the broker's statements may be evidence of

actual confusion not just on the part of consumers, but by one of BTE Nevada's own brokers.

Assuming that the broker's statements are not a willful attempt to deceive consumers, they must

be proof that the broker herself is confused.  BTE Nevada did not exist until 2006 and it did not

operate a barter exchange business until recently. (Yarmak Decl. ¶ 6).  The broker, therefore,

could not have worked for BTE Nevada for 13 years.  Yet more troubling is the fact that the

broker appears to think that she is working for the same company that sold the BXI exchange

business in 2005.

The broker's representations support the conclusion that Defendants' actions were

deliberate and willful because they must be interpreted either as a deliberate attempt to confuse

consumers by referencing BXI's history or as the broker's own confusion as to BTE Nevada's

relationship to the original BXI business exchange.

Finally, Defendants' adoption of similar, if not identical, trademarks also indicates a

willful attempt to confuse consumers into thinking that BTE Nevada is affiliated with the

1   original BXI exchange business.  The validity of Defendants' registered marks is not at issue in

2   the present Motion, and the Court makes no representation as to the merits of ITEX's false

3   designation of origin and infringement claims.  Nevertheless, Defendants choice to pursue the

4   use and registration of a mark that consumers would undoubtedly associate with the original BXI

5   exchange business is yet additional proof that Defendants' acted deliberately, regardless of

6   whether the trademark is found to be valid and non-infringing.

7          Therefore, for the foregoing reasons, the Court finds that this is an exceptional case

8   warranting the award for attorneys' fees incurred in relation to ITEX's second and third causes

9   of action for false or misleading advertising.  ITEX is instructed to file the appropriate affidavits

10  and documentation to determine the appropriate amount of the award.

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24

**CONCLUSION**

IT IS HEREBY ORDERED that ITEX's Motion for Partial Summary Judgment (ECF No. 22) is GRANTED.

IT IS FURTHER ORDERED that Defendants are permanently enjoined from disseminating any additional false or misleading statements that imply that BTE Nevada is in any way affiliated with, related to, or the successor-in-interest of the original BXI exchange business that was owned and operated by BX International, BTE California, and BEI and that was subsequently purchased by ITEX, in conformity with Section III.B of this Order.

IT IS FURTHER ORDERED that ITEX is entitled to recover attorneys' fees relating to the second and third causes of action of the Complaint.  ITEX is ordered to file the affidavits and documentation required by Local Rule 54-16 so that the appropriate amount of fees may be determined.  This may be done in the form of a motion, as Defendants have the right to challenge the amount of fees that ITEX seeks to recover.

IT IS SO ORDERED.


DATED: This 11th day of February, 2015

_____
ROBERT C. JONES
United States District Judge

28